## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) WEINGARTEN REALTY INVESTORS,<br>    a Texas real estate investment trust,<br>(2) WEINGARTEN NOSTAT, INC.,<br>    a Texas corporation, and<br>(3) BOULEVARD MARKET PLACE<br>  ACQUISITION COMPANY, LLC.,<br>    a Delaware limited liability company,<br><br>    Plaintiffs,<br><br>v.<br><br>(1) BRITE CLEANERS, INC.,<br>(2) DONALD GENE LEWELLEN, JR.,<br>(3) MARTHA G. LEWELLEN,<br>(4) J.D. THOMPSON AND ASSOCIATES, INC.,<br>    a/k/a STR ENTERPRISES, INC.,<br>    an Oklahoma corporation,<br>(5) R&R MFG. & SUPPLY, INC.,<br>    an Oklahoma corporation,<br>(6) FABRICLEAN SUPPLY OF OKLAHOMA<br>    LIMITED PARTNERSHIP,<br>    a Delaware limited partnership,<br>(7) CONE SOLVENTS, INC.,<br>    a Tennessee corporation, and<br>(8) FRONTIER LOGISTICAL SERVICES, LLC,<br>    a Tennessee limited liability company,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><br><br><br><br><br><br>Case No. CIV-18-971-JD |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER APPROVING SETTLEMENT

Before the Court are Defendants' Unopposed Motion to Approve Settlement and

Request for Fairness Hearing ("Settlement Approval Motion") [Doc. No. 158], Plaintiffs'

Motion to Enter Proposed Order Approving Settlement ("Plaintiffs' Motion") [Doc. No.

173], and Plaintiffs' Motion for Settlement on Defendants' Proposed Order Approving

Settlement ("Plaintiffs' Second Motion") [Doc. No. 186] (together, the "Motions").

Defendants BRITE CLEANERS, INC., DONALD GENE LEWELLEN, JR., (collectively "Brite Defendants"), MARTHA LEWELLEN, J.D. THOMPSON AND ASSOCIATES, INC. a/k/a STR ENTERPRISES, INC. ("J.D. Thompson"), R&R MFG. & SUPPLY, INC. ("R&R"), FABRICLEAN SUPPLY OF OKLAHOMA LIMITED PARTNERSHIP ("FabriClean"), FRONTIER LOGISTICAL SERVICES, LLC ("Frontier"), and CONE SOLVENTS, INC. ("Cone") (collectively, the "Defendants"), and Plaintiffs WEINGARTEN REALTY INVESTORS, WEINGARTEN NOSTAT, INC., and BOULEVARD MARKET PLACE ACQUISITION COMPANY, LLC (collectively, the "Plaintiffs") have entered into a settlement of all claims in this case, *see* [Doc. No. 157]. The parties originally disagreed on the language of a proposed order approving the settlement and submitted different proposed orders. *See, e.g.*, Plaintiffs' Joint Proposed Order and Findings of Fact and Conclusions of Law [Doc. No. 173-1]; Defendants' Joint Proposed Order and Findings of Fact and Conclusions of Law [Doc. No. 173-4]; Defendants' Joint Proposed Order and Findings of Fact and Conclusions of Law with comments [Doc. No. 173-6].

The Court held a fairness hearing on August 5, 2021. Following the fairness hearing, on August 26, 2021, counsel submitted Plaintiffs' Proposed Order on the August 5, 2021 Fairness Hearing and Defendants' Proposed Order on the August 5, 2021 Fairness Hearing to the Court's orders inbox. Plaintiffs' counsel later submitted that they agreed to Defendants' proposed order. [Doc. No. 186].

Upon its review of the Motions and the submissions, and for the reasons stated

below, the Court GRANTS the Settlement Approval Motion and the remaining Motions AS MODIFIED and ENTERS the following Order.[1]

## I.     Procedural History and Case Background

1.      As set forth below, Plaintiffs have generally alleged that soil and groundwater were contaminated with dry-cleaning solvents (Tetrachloroethane (PCE)), and their degradation products (Trichlorethene (TCE), and cis-1, 2-Dichloroethene (c-DCE)). Plaintiffs alleged that these chemicals were present at the location of the former Brite Cleaners' plant at the Boulevard Market Shopping Center, 101 N. Douglas Blvd., Midwest City, OK (the "Site") and that these same chemicals were found on contiguous property downgradient from the Site. Plaintiffs also claimed that the Defendants caused these chemicals to be released into the groundwater and Plaintiffs sought damages under Oklahoma common law and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

2.      Plaintiff Weingarten Realty Investors filed claims against the Brite Defendants in the Western District of Oklahoma in a matter captioned *Weingarten Realty Investors v. Brite Cleaners, Inc., et al*., Case No. 5:18-cv-971 on October 4, 2018. [Doc. No. 1].

3.      The Brite Defendants filed their Answers to Plaintiffs' allegations, denying liability. [Doc. Nos. 6 and 10].

---

[1] The Court submitted a draft of this order and the administrative closing order to counsel for the parties and received approval for the entry of the orders. The hearing on October 19, 2022 is therefore unnecessary. *See* [Doc. No. 188].

4.     The Court entered a Scheduling Order on April 8, 2019, ordering the close of discovery by June 1, 2020, with a trial docket of July 2020. The Scheduling Order also noted that motions to amend pleadings and/or join additional parties must be filed within 30 days. [Doc. No. 14].

5.     On May 8, 2019 (corrected on May 22, 2019) Plaintiff Weingarten Realty Investors filed a motion to amend its original complaint to add the additional Plaintiffs and to add Martha Lewellen and the estate of Donald G. Lewellen, the parents of Donald Lewellen, Jr., as defendants. [Doc. Nos. 17 and 18]. The Court granted the corrected request. [Doc. No. 19].

6.     On June 18, 2019, Plaintiffs filed an Amended Complaint against the Brite Defendants, the estate of Donald G. Lewellen, and Martha Lewellen. [Doc. No. 20].

7.     The Brite Defendants and Martha Lewellen filed their Answers to Plaintiffs' Amended Complaint on June 27, 2019. [Doc. Nos. 21, 22, and 24].

8.     On November 27, 2019, after discovery, Plaintiffs sought leave to amend their complaint again to add the remaining defendants, with the exception of Frontier, which the Court granted. [Doc. Nos. 30 and 31].

9.     On December 16, 2019, Plaintiffs filed a Second Amended Complaint adding additional Defendants to the lawsuit. [Doc. No. 33].

10.     The Brite Defendants answered Plaintiffs' Second Amended Complaint on December 30, 2019, and asserted crossclaims against J.D. Thompson, FabriClean, Cone, and R&R, and asserted counterclaims against Plaintiffs. [Doc. Nos. 36–37].

11.     Martha Lewellen answered the Second Amended Complaint on December

30, 2019. [Doc. No. 38].

12.    The estate of Donald G. Lewellen had not been served, and the Court ordered Plaintiffs to show cause on the same on January 6, 2020. [Doc. No. 44].

13.    R&R filed its Answer to the Second Amended Complaint on January 15, 2020, and its Answers to the crossclaims of the Brite Defendants on January 15, 2020, and January 16, 2020, all denying liability. [Doc. Nos. 52, 53, 56].

14.    J.D. Thompson filed its Answers to the Second Amended Complaint and crossclaims on February 18, 2020, all denying liability. [Doc. Nos. 79–81].

15.    FabriClean moved to dismiss Plaintiffs' Second Amended Complaint on January 10, 2020, and moved to dismiss the crossclaims on January 22, 2020. [Doc. Nos. 49 and 58].

16.    On February 19, 2020, at the hearing on FabriClean's motions to dismiss and order for Plaintiffs to show cause regarding the service of the estate of Donald G. Lewellen, the Court granted FabriClean's motions to dismiss. At a status conference after the hearing, the Court entered a new scheduling order allowing Plaintiffs to file a third amended complaint and setting a deadline for Plaintiffs to serve the estate of Donald G. Lewellen. [Doc. Nos. 84–86].

17.    On April 20, 2020, Plaintiffs filed a Third Amended Complaint against all Defendants and added Frontier as a defendant. [Doc. No. 90].

18.    R&R filed its Answer to the Third Amended Complaint on April 28, 2020, denying liability. [Doc. No. 92].

19.    J.D. Thompson filed its Answer to the Third Amended Complaint on May

4, 2020, denying liability. [Doc. No. 93].

20.    On May 4, 2020, Martha Lewellen filed her Answer denying liability. [Doc. No. 95]. The Brite Defendants filed their Answer to Plaintiffs' Third Amended Complaint on May 4, 2020, denying liability. [Doc. No. 94]. Brite asserted crossclaims against Frontier, J.D. Thompson, Cone, R&R, and FabriClean. [*Id.*]. Brite also asserted counterclaims against Plaintiffs. [*Id.*]. Answers were filed to these claims denying liability. [Doc. No. 96 (R&R), Doc. No. 98 (J.D. Thompson), Doc. No. 99 (Plaintiffs), Doc. No. 106 (FabriClean)].

21.    FabriClean filed its Answer to the Third Amended Complaint on May 27, 2020, denying liability. FabriClean asserted crossclaims against all Defendants and counterclaims against all Plaintiffs. [Doc. No. 100]. Answers were filed to these claims denying liability. [Doc. No. 105 (R&R), Doc. No. 107 (Brite Defendants and Martha Lewellen), Doc. No. 108 (J.D. Thompson), Doc. No. 110 (Plaintiffs)].

22.    Frontier filed its Answer to the Third Amended Complaint on June 15, 2020, denying liability. Frontier asserted counterclaims and crossclaims against Plaintiffs, Brite Defendants, FabriClean, J.D. Thompson, and R&R. [Doc. No. 109]. Answers were filed to Frontier's claims denying liability. [Doc. No. 114 (R&R), Doc. No. 115 (FabriClean), Doc. No. 116 (Plaintiffs), Doc. No. 117 (J.D. Thompson), Doc. No. 118 (Brite Defendants)].

23.    After no service was completed after the Court permitted an extension, the estate of Donald G. Lewellen Sr. was dismissed without prejudice on June 1, 2020. [Doc. No. 104].

24.     On September 28, 2020, FabriClean filed its motion for summary judgment. On March 8, 2021, J.D. Thompson filed its motion for summary judgment. Responses and replies were filed. [Doc. Nos. 120, 122, 124–126, 133, and 147].

25.     The Scheduling Order required all motions to amend pleadings to be filed by April 20, 2020. The Scheduling Order required that Plaintiffs file their expert witness list and submit expert reports by January 6, 2021, and file their final lists of witnesses and exhibits by January 20, 2021. The Scheduling Order required that Defendants file their expert witness list and submit expert reports by January 20, 2021, and file their final witness and exhibit lists by February 3, 2021. The Scheduling Order set this matter for the July 2021 trial docket. [Doc. No. 86].

26.     Defendants filed their witness and exhibit lists by February 3, 2021. [Doc. Nos. 127–131]. Plaintiffs did not timely file expert, witness, or exhibit lists.

27.     On March 22, 2021, Plaintiffs filed a motion to amend and file a fourth amended complaint and a motion to amend scheduling order. [Doc. Nos. 137–139]. At this point in the case, many deadlines in the Court's Amended Scheduling Order had already expired, including the deadlines for joinder of additional parties or amendment of pleadings, witness and exhibit lists, expert reports, the close of discovery, and the deadlines to file dispositive and *Daubert* motions. [Doc. No. 86]. These motions were opposed. [Doc. Nos. 142–143, 145–146, 150–151].

28.     At a hearing on April 6, 2021, the Court denied Plaintiffs' Motion to Amend Scheduling Order and Motion to Amend the Complaint for, among other reasons, failure to establish good cause or excusable neglect under the applicable standards and

failure to meet the required standards. [Doc. No. 155].

29.     The parties participated in a Court-ordered mediation and reached a settlement. In his report to the Court, the mediator (an attorney experienced in environmental law) reported the mediation required 8.75 hours to complete. [Doc. No. 157].

30.     Defendants filed a Motion for Settlement Approval and Fairness Hearing on June 18, 2021, which included the Settlement Agreement as an exhibit. [Doc. No. 158]. The terms of the Settlement Agreement required, as a condition precedent, a fairness hearing to be conducted and an order providing that Defendants' settlement payments be credited *pro tanto* and which bars all past, present, and future claims against these Defendants relating to the Site, including claims for contribution under 42 U.S.C. § 9613(f)(1). [Doc. No. 158-1].

31.     The Court granted the request for a fairness hearing. [Doc. No. 160]. The Court ordered the parties to put on evidence of the fairness of the settlement at the hearing. [*Id.* at 1]. The Court further ordered the parties to file exhibit and witness lists, and to submit a proposed order approving the settlement. [*Id.* at 2]. The Court's requirements for the fairness hearing were later clarified in that affidavits were permitted to be submitted. [Doc. No. 166].

32.     The parties filed exhibit and witness lists and supplemental submissions in support of their position that the settlement should be approved. [Doc. Nos. 168–172, 174, 181, 183].

33.     The Court conducted a fairness hearing on August 5, 2021. [Doc. No. 182].

34.     Defendants offered evidence at the fairness hearing [Doc. No. 182 and exhibits]; Plaintiffs offered no evidence at the fairness hearing [*see also* Doc. No. 170].

35.     As set forth more fully above, Plaintiffs sought to file a Fourth Amended Complaint to bring in three chemical manufacturers and a waste disposal company, and sought to amend the Amended Scheduling Order to reset the expired deadline for witness lists, exhibit lists, and expert reports. The Court denied the Motion to Amend the Complaint and Motion to Extend the Scheduling Order. [Doc. No. 155].

36.     Due to this denial, Defendants contend that Plaintiffs are without the sufficient evidentiary support to put on a case against Defendants due to the lack of witnesses who could testify at trial, exhibits to support the same, and expert reports.

37.     Further, Defendants contend that there exists no evidence in the record from Plaintiffs on fulfilling the National Contingency Plan requirements that establishes the methods and criteria for determining the type and extent of response actions that are authorized under CERCLA.

38.     Both Plaintiffs and Defendants agree that their settlement is fair, adequate, and reasonable due to each party's respective positions, including (1) the sums they have agreed to pay, (2) the allegations against them as to their alleged share of liability, and (3) the strength of the evidence for and against them.

II.     **Findings of Fact**

39.     The Brite Defendants and Martha Lewellen submitted evidence through an affidavit and testimony by Don Lewellen.

40.     Don Lewellen is the current owner and operator of Brite Cleaners. Don

Lewellen has operated Brite Cleaners since 1986. *See* Affidavit of Donald Lewellen, [Doc. No. 182-1] ¶¶ 1–2.

41.    Martha Lewellen is Don Lewellen's mother. Martha Lewellen was listed as the Registered Agent of Brite Cleaners starting in 2014. The Brite Defendants presented evidence that Martha Lewellen had no ownership authority over Brite Cleaners at any time, and that Martha Lewellen had no control over the operations of Brite Cleaners as this was undertaken by her son, Don Lewellen. The Brite Defendants presented evidence that Martha Lewellen did not participate in any management of Brite Cleaners. [*Id.* ¶¶ 16–17, Affidavit Exhibit E].

42.    Brite Cleaners was created in 1986 and incorporated in 1992. [*Id.* ¶ 2, Affidavit Exhibit A].

43.     Brite Cleaners previously operated at the Site from 1986 until 2018. However, according to Brite Cleaners, it has not been an active plant where dry cleaning was done on site since 1995. [*Id.* ¶¶ 2, 5].

44.    Brite Cleaners presented evidence that it leased the Site from Weingarten Nostat, Inc., who took over the property from another entity, and that prior to the lease renewal in 1995, representatives from Weingarten Nostat, Inc. told Don Lewellen that he could no longer operate a plant at the Site as their insurer would not allow it. Brite Cleaners presented evidence that because of this notification, Brite Cleaners closed its plant at the Site and was only a drop-off location until closing this location in December 2018. [*Id.* ¶ 3].

45.    In [Doc. No. 182-1], Brite Cleaners presented evidence that:

- It operated a single dry-to-dry machine at the Site, which utilized chemical solvents to clean garments.

- Although the machine operated until 1995, it was not utilizing Perchloroethylene (PERC) also known as Tetrachloroethene, during the entirety of the plant's existence.

- Several years before, Brite Cleaners switched to utilizing petroleum as a cleaning agent.

- It purchased PERC from third parties, and the latest record of purchases of PERC were in early 1992.

46.    Brite Cleaners presented evidence that it utilized third parties that engaged in the transport, handling, and/or destruction of PERC, and that these companies were engaged to pump in the material and remove and transport the waste away from the facility. Brite Cleaners presented evidence that once the waste was removed from the Brite Cleaners' machine, Brite Cleaners was not aware where it went or what these companies did with it. [*Id.* ¶¶ 8–9].

47.    Brite Cleaners presented evidence that it did not engage in the handling, transporting, or destruction of the cleaning solvents or solvent waste, including Tetrachloroethane (or Perchloroethylene (PCE)), Trichloroethene (TCE), or cis-1, 2-Dichloroethene (c-DCE). [*Id.* ¶¶ 8–9, 12].

48.    Brite Cleaners presented evidence that the Environmental Protection Agency certified that Brite Cleaners was a Conditionally Exempt Small Quantity Generator with a Resource Conservation and Recovery Act ("RCRA") notifier license

OKD173397480. This meant Brite Cleaners produced less than 1,000 kg of hazardous waste a month. [*Id.* ¶ 11, Affidavit Exhibit C].

49.     Brite Cleaners presented evidence that in 2011, the insurer for Weingarten Realty Investors contacted Brite Cleaners stating that it had been put on notice of the existence of chlorinated solvents at the Site and made an indemnification demand, but did not advise as to when Plaintiffs were aware of the contamination. [*Id.* ¶¶ 14–15, Affidavit Exhibit D].

50.     The Brite Defendants contend that other than these letters, the Brite Defendants were not notified of the contaminants or chlorinated solvents allegedly found within the groundwater, when they were found, or where they were specifically sourced. The Brite Defendants claimed that they were never contacted by DEQ or Plaintiffs as to when the alleged contaminants were found, or how it could be attributed to Brite Cleaners given the locations of the contaminant plumes (being at a distance from the former plant location) and the other possible responsible parties nearby. [*Id.* ¶ 15].

51.     The Brite Defendants and Martha Lewellen have alleged that disputed issues exist regarding their liability and the applicability of their defenses. At this point in the litigation and based on everything before the Court, the Court agrees.

52.     The Brite Defendants and Martha Lewellen have considered the cost to litigate this matter and believe that settlement is in their best interest. [*Id.* ¶ 22].

53.     The parties mediated, with all parties represented by counsel, and the Brite Defendants along with Martha Lewellen agreed to pay $150,000.00 of the $335,000.00 agreed settlement. [*Id.* ¶¶ 20–21]; *see also* [Doc. No. 158-1 at 1–2]. Given these findings

and circumstances, as well as the strengths and weaknesses that the Court and the parties perceive about their respective positions, the Court finds that the settlement amount paid on behalf of the Brite Defendants and Martha Lewellen is fair and reasonable.

54.     J.D. Thompson was formed on February 20, 1976, by Mr. J.D. Thompson, Suzanne Thompson's father. *See* Affidavit of Suzanne Thompson [Doc. No. 182-2] ¶ 1.

55.      In or about 1991 Suzanne Thompson became a minority owner of J.D. Thompson and helped operate the company on a limited basis. Thereafter, in or about 1995, Suzanne Thompson became the owner of all of J.D. Thompson's stock and operated the company. [*Id.* ¶ 2].

56.     J.D. Thompson presented evidence through testimony of its prior owner, Suzanne Thompson, denying the use or sale of Tetrachloroethane, or cis-1, 2-Dichloroethene (c-DCE), or Trichloroethene (TCE). J.D. Thompson admits that it did sell and transport dry cleaning grade Perchloroethylene. [*Id.* ¶ 3].

57.     Through testimony of its prior owner, Suzanne Thompson, J.D. Thompson has denied that it disposed of Tetrachloroethane (PCE), Trichloroethene (TCE), or cis-1, 2-Dichloroethene (c-DCE). [*Id.* ¶ 4]. Plaintiffs contend otherwise based on the statements of Don Lewellen.

58.     On April 29, 2013, J.D. Thompson entered into an asset sale with FabriClean. [*Id.* ¶ 6].

59.     Between May 31, 2013, and June 27, 2014, J.D. Thompson donated and/or sold all assets not transferred to FabriClean. [*Id.* ¶ 7].

60.     J.D. Thompson presented evidence that J.D. Thompson was dissolved on or about June 30, 2014. [*Id.* ¶ 8]. *See also* Certificate of Dissolution documentation submitted to the Oklahoma Secretary of State and Certificate of Dissolution attached as Affidavit Exhibits 1 and 2 to the Affidavit of Suzanne Thompson.

61.     J.D. Thompson presented evidence that as of 2014, J.D. Thompson has no company assets. [Doc. No. 182-2 ¶ 9].

62.     J.D. Thompson claims that disputed issues exist regarding its liability, the applicability of its defenses, and the strength of Plaintiffs' case against it. At this point in the litigation and based on everything before the Court, the Court agrees.

63.     The parties mediated and J.D. Thompson agreed to pay $35,000.00 of the $335,000.00 agreed settlement. [Doc. No. 158-1 at 2]. Given these findings and circumstances, as well as the strengths and weaknesses that the Court and the parties perceive about their respective positions, the Court finds that the settlement amount paid by J.D. Thompson is fair and reasonable.

64.     R&R presented evidence through an affidavit and testimony of Lindon Ford that for many years it was an Oklahoma corporation in the business of selling dry cleaning supplies. *See* Affidavit of Lindon Ford [Doc. No. 182-3] ¶¶ 1–2.

65.     From 1972 to 2008, R&R was owned and operated by Lindon Ford and his wife Shirley Ford. [*Id.* ¶ 2].

66.     Through the testimony of Lindon Ford, R&R has denied that it used or sold Tetrachloroethane (PCE) or cis-1, 2-Dichloroethene (c-DCE), or Trichloroethene (TCE). R&R did sell and transport dry cleaning grade Perchloroethylene. [*Id.* ¶ 3].

67.     Through the testimony of Lindon Ford, R&R has denied that it disposed of
Tetrachloroethane (PCE), Trichloroethene (TCE), or cis-1, 2-Dichloroethene (c-DCE).
[*Id.* ¶ 4].

68.     Through the testimony of Lindon Ford, R&R has denied the facilitation,
disposal of, or arrangement for transportation for disposal of waste containing
Tetrachloroethane (PCE), Trichloroethene (TCE), or cis-1, 2-Dichloroethene (c-DCE), or
Perchloroethylene at or near the site at issue in the present case. [*Id.* ¶ 5].

69.     R&R was dissolved on or about December 30, 2008. [*Id.* ¶ 6]. *See also*
Oklahoma Secretary of State – Certificate of Dissolution [Doc. No. 182-4].

70.     R&R presented evidence that it has no company assets remaining
subsequent to its dissolution in 2008. [Doc. No. 182-3 ¶ 7].

71.     R&R contends that disputed issues exist regarding its liability, the
applicability of its defenses, and the strength of Plaintiffs' case against it. At this point in
the litigation and based on everything before the Court, the Court agrees.

72.     The parties mediated, with all parties represented by counsel, and R&R
agreed to pay $100,000.00 of the $335,000.00 agreed settlement. [Doc. No. 158-1 at 2].
Given these findings and circumstances, as well as the strengths and weaknesses that the
Court and the parties perceive about their respective positions, the Court finds that the
settlement amount paid by R&R is fair and reasonable.

73.     Plaintiff's Third Amended Complaint [Doc. No. 90] alleges that Frontier is
liable as a successor of Cone Solvents, Inc. and that Frontier is responsible as a successor
for the acts and omissions of Cone for the time before Frontier purchased the assets of

Cone. The Third Amended Complaint further alleges Cone is a potentially responsible party as defined by CERCLA. Specifically, Plaintiff's Third Amended Complaint claims that Cone sold, transported, or arranged for the transport, collection, or disposal of used hazardous substances in connection with the operations of Brite Cleaners. [Doc. No. 90].

74.     Frontier denies it is a corporate successor of Cone and thus claims it cannot be held liable for the alleged actions of Cone. [Doc. No. 109].

75.     Frontier also denies that Cone sold, transported, or arranged for the transportation, collection, or disposal of used hazardous substances in connection with Defendant Brite Cleaners. *See* Declaration of Susan Cone Ligon [Doc. No. 182-7] ¶¶ 10–17; Declaration of Tom Cone [Doc. No. 182-6] ¶¶ 6–9; Declaration of Mike Cummings [Doc. No. 182-8] ¶¶ 5–11.

76.     Evidence of the following was presented at the hearing without objection:

a.     The business of Cone was to sell virgin solvent, a CERCLA designated hazardous substance, to customers. [Doc. Nos. 182-7 ¶¶ 9–10; 182-6 ¶ 3; 182-8 ¶¶ 5–6].

b.     Evidence was presented that from its inception in 1980, Cone sold only virgin solvents and never picked up, transported, arranged for transport, disposed of or arranged for disposition of any used solvent or other hazardous waste. [Doc. Nos. 182-7 ¶¶ 9–17; 182-6 ¶¶ 3–9; 182-8 ¶¶ 5–11].

c.     Evidence was presented that in the late 1990s, Cone stopped selling solvents to dry cleaners, including Brite Cleaners, because dry cleaners wanted services for collection and disposal of used solvent, which Cone did

not offer or provide. [Doc. Nos. 182-7 ¶¶ 10, 16; 182-6 ¶ 5].

d.      Evidence was presented that Cone did not have the equipment necessary to

collect, transport or dispose of used solvent nor did Cone ever have any

license or permit to collect, transport, dispose of or recycle used solvent.

[Doc. Nos. 182-7 ¶¶ 13, 17; 182-6 ¶ 9; 182-8 ¶¶ 9–10].

e.      Evidence was presented that Cone refused to dispose of used solvent in any

manner. [Doc. Nos. 182-7 ¶ 15; 182-6 ¶¶ 5–9; 182-8 ¶¶ 6–8].

f.      Evidence was presented that in 2010, Frontier acquired most of the assets

of Cone in an Asset Purchase Agreement that excluded the purchase of

liabilities of Cone. *See* Declaration of Vic Alexander [Doc. No. 182-5]

¶¶ 3–4.

g.      Evidence was presented that after acquisition of the assets, Frontier

continued to employ some of the same employees which had previously

been employed by Cone. [Doc. No. 182-5 ¶ 5].

h.      Evidence was presented that Frontier also continued to employ some of the

supervisory employees previously employed by Cone. [*Id.* ¶ 6].

i.      Evidence was presented that as part of the asset purchase, Cone's

equipment, and the real property, were acquired from Cone by Frontier. [*Id.*

¶ 7].

j.      Evidence was presented that Frontier sold many of the same products

previously sold by Cone. [*Id.* ¶ 8].

k.      Evidence was presented that after selling its assets, Cone was dissolved and

that similar operations were continued by Frontier, although the prior entity and management team were no longer in existence. [*Id.* ¶ 9].

l.    Evidence was presented that Frontier continued to use "Cone Solvents" as a trade name but Cone was not maintained as an entity following the asset purchase. [*Id.* ¶ 10].

m.    Evidence was presented that while Cone sold the majority of its assets to Frontier and Frontier shared some commonality of ownership, Frontier's ownership included only some of the owners of Cone while other owners of Frontier were never owners of Cone. Additionally, evidence was presented that the controlling ownership of Frontier was different than the controlling ownership of Cone. [*Id.* ¶ 11].

77.    FabriClean was formed as an Oklahoma limited partnership on or about August 22, 2005. Affidavit of James A. Hericks [Doc. No. 182-9] ¶ 3. It was restructured as a Delaware entity on or about November 21, 2011. [*Id.*].

78.    Defendants contend that disputed issues exist, including whether third parties could be shown to be arrangers with a specific intent to dispose of hazardous wastes, the application of the useful-product doctrine, and successor liability including whether there is a continuation of the corporate entity (relying on caselaw including *Crutchfield v. Marine Power Engine Co.*, 2009 OK 27, ¶ 1, 209 P.3d 295, 297). Thus, these defendants contend that disputed issues exist regarding their liability, the applicability of their defenses, and the strength of Plaintiffs' case against them. At this point in the litigation and based on everything before the Court, the Court agrees.

79.     The parties mediated, with all parties represented by counsel, and Frontier and Cone agreed to pay (jointly) $30,000.00 of the $335,000.00 agreed settlement, and FabriClean agreed to pay $20,000.00 of the $335,000.00 agreed settlement. [Doc. No. 158-1 at 2]. Given these findings and circumstances, as well as the strengths and weaknesses that the Court and the parties perceive about their respective positions, the Court finds that the settlement amounts paid by Cone and Frontier and FabriClean are fair and reasonable. In making its findings in this Order, the Court has considered all evidence, pleadings, and motions before it.

### III.     **Conclusions of Law**

80.     CERCLA, 42 U.S.C. § 9607(a), allows private parties to recover costs incurred in cleaning up contaminated sites from certain parties enumerated by statute and imposes liability on persons for disposal of hazardous waste.

81.     Plaintiffs' first cause of action requests remedies under section 107(a) for cost recovery for damages to natural resources. Plaintiffs' second cause of action requests remedies under sections 107(a) and 113(f) for contribution. Plaintiffs' third claim requests remedies under section 112(c) for subrogation and contribution. Plaintiffs' fourth cause of action subject to section 113(g) requests declaratory judgment for future costs. Plaintiffs' fifth claim requests remedies for negligence and successor liability. [Doc. No. 90].

82.     In order "[t]o establish a prima facie case under § 107(a), a plaintiff must prove (1) the site is a facility, (2) defendant is a responsible person, (3) the release or threatened release of a hazardous substance has occurred, *and* (4) the release or

threatened release caused the plaintiff to incur necessary response costs consistent with the National Contingency Plan (NCP)." *Young v. United States*, 394 F.3d 858, 862 (10th Cir. 2005) (citing 42 U.S.C. §§ 9607(a) and 9613(f)).

83.     Subsection 9 of § 9601 defines "facility" to mean "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel."

84.     The United States Supreme Court has noted that the four categories of persons subject to liability under 42 U.S.C. § 9607(a) are as follows:

(1)     the owner and operator of a vessel or a facility;

(2)     any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;

(3)     any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

(4)      any person who accepts or accepted any hazardous substances for transport

to disposal or treatment facilities, incineration vessels or sites selected by

such person, from which there is a release, or a threatened release which

causes the incurrence of response costs, of a hazardous substance.

*Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 608–09 (2009) (citing

42 U.S.C. § 9607(a)). As explained by the Supreme Court, these statutes present the

threshold requirement for liability under CERCLA that a defendant must fit within one of

these enumerated categories to be liable under CERCLA. *Id.*

85.      Subsection 1 of § 9607(a) concerns "owner[s] and operator[s]" of a "vessel

or a facility." Subsection 28 of 42 U.S.C. § 9601, which provides definitions for the

chapter, defines "vessel" to mean "every description of watercraft or other artificial

contrivance used, or capable of being used, as a means of transportation on water."

86.      Subsections 2, 3, and 4 of § 9607(a) concern disposal, and particularly

those persons which own or owned disposal locations, "arranged for disposal," or

transported hazardous substances to disposal facilities from which a leak or discharge

occurred.

87.      A claim brought pursuant to Section § 113(f) allows a party to obtain

contribution during or following any civil action under CERCLA sections 106 or 107. 42

U.S.C. § 9613.

88.      CERCLA section 112(c) provides that "[a]ny person, including the Fund,

who pays compensation pursuant to this chapter to any claimant for damages or costs

resulting from a release of a hazardous substance shall be subrogated to all rights, claims,

and causes of action for such damages and costs of removal that the claimant has under

this chapter or any other law." 42 U.S.C. § 9612(c)(2). Subrogation and contribution

under this section only apply if the United States Government and a Fund are involved in

the matter. *See id.*

89.     CERCLA section 113(g) provides that in any action for recovery of

response costs under CERCLA section 107, "the court shall enter a declaratory judgment

on liability for response costs or damages that will be binding on any subsequent action

or actions to recover further response costs or damages. 42 U.S.C. § 9613(g)(2). Further,

the statute of limitations for section 113(g) claims is three years. *See id.*

90.     Courts have "recognized that §§ 107(a) and 113(f) provide two 'clearly

distinct' remedies." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 138 (2007) (quoting

*Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 163 n.3 (2004)); *see also Cooper

Indus.*, 543 U.S. at 163 ("CERCLA provided for a right to cost recovery in certain

circumstances, § 107(a), and separate rights to contribution in other circumstances,

§§ 113(f)(1), 113(f)(3)(B)."). Liability for costs incurred by the government or a private

party in cleaning up a site is imposed by section 107(a), which provides responsible

parties are liable for "(A) all costs of removal or remedial action incurred by the United

States Government or a State or an Indian tribe not inconsistent with the national

contingency plan; [and] (B) any other necessary costs of response incurred by any other

person consistent with the national contingency plan . . . ." Under section 113(f), "[a]ny

person may seek contribution from any other person who is liable or potentially liable

under Section 9607(a) of this title . . . ." Section 107 permits a party to seek joint and

several liability against one or more defendants for all of its cleanup costs. In contrast, section 113 provides for contribution.

91.     To be held liable under CERCLA as an arranger, three conditions must be satisfied: (1) the party must be a "person" as defined in CERCLA; (2) the party must "own" or "possess" the hazardous substances prior to the disposal; and (3) the party must, "by contract, agreement or otherwise," arrange for the transport or disposal of such hazardous substances. *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1279 (10th Cir. 2017); *Raytheon Constructors, Inc. v. Asarco Inc.*, 368 F.3d 1214, 1219 (10th Cir. 2003).

92.     According to the Defendants, what classifies as "arranger" liability under 42 U.S.C. § 9607(a)(3) is not always clear cut, as there "is no bright line between a sale and a disposal under CERCLA. A party's responsibility . . . must by necessity turn on a fact-specific inquiry into the nature of the transaction." *Burlington N.*, 556 U.S. at 610 (citations omitted). Still, "[i]t is plain from the language of the statute that CERCLA liability would attach under § 9607(a)(3) if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance. It is similarly clear that an entity could not be held liable as an arranger merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." *Id.* at 609–10 (citations omitted). Interpreting the Supreme Court's decision in *Burlington Northern*, the Fifth Circuit Court of Appeals explained "the Court interpreted the term 'arrange' to imply 'action directed to a specific purpose' and held that 'an entity may qualify as an

arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance.'" *Vine St. LLC v. Borg Warner Corp.*, 776 F.3d 312, 316 (5th Cir. 2015) (quoting *Burlington N.*, 556 U.S. at 611).

93.     Generally, a federal court has applied the successor liability law of the state in which it sits to determine whether one entity will be responsible for another's liabilities. However, both the Northern and Western Districts of Oklahoma have determined that federal common law applies to issues of successor liability under CERCLA. *See Horsehead Indus., Inc. v. St. Joe Mins. Corp.*, No. 94-C-98-B, 1996 WL 33415778, at *18–*19 (N.D. Okla. Apr. 2, 1996) ("The need for national uniformity of CERCLA liability requires that federal common law govern the imposition of successor liability under CERCLA."); *United States v. Hardage*, 761 F. Supp. 1501, 1513–14 (W.D. Okla. 1990) (citing and adopting language from *Smith Land & Imp. Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir. 1988), which instructed the court below to apply federal common law to determine whether successor liability will attach to a party).

94.     In *Horsehead*, the Northern District of Oklahoma advised that "[t]he broad remedial purpose of CERCLA requires application of the more flexible continuity of enterprise theory of successor liability to prevent responsible parties from evading CERCLA liability through strategic behavior or transactional technicalities." *Horsehead*, 1996 WL 33415778, at *18 (citations omitted). Thereafter, the court explained and set out the factors which federal courts ought to consider when applying the "continuity of enterprise" test:

- whether the successor retains the same employees;

- whether the successor retains the same supervisory personnel;

- whether the successor retains the same production facilities in the same location;

- whether the successor produces the same products;

- whether there is a continuity of assets and business operations;

- whether the successor retains the same business name; and

- whether the successor holds itself out to the public as a continuation of the previous enterprise.

*Id.* at *19 (citing *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992)).

95.     Here, the parties agreed that the "continuity of enterprise" test applies to determine whether a defendant has CERCLA liability as a successor to a prior entity. And here, the evidence is mixed on this issue, further supporting the appropriateness of a settlement.

96.     In Oklahoma, "[t]he essential elements of negligence are (1) a duty owed by defendant to protect plaintiff from injury, (2) a failure to properly exercise or perform that duty, and (3) injuries to plaintiff proximately caused by defendant's failure to exercise his duty of care." *Ring v. Lexington Apartments & Motor Inns-Okla.*, 3 F. App'x 847, 850 (10th Cir. 2001) (unpublished) (quoting *Copeland v. Admiral Pest Control Co.*, 1996 OK CIV APP 119, 933 P.2d 937, 939).

97.     In determining whether a settlement is fair and reasonable, and consistent

with the purposes of CERCLA, the Court weighs the strength of Plaintiffs' case and Defendants' actual or potential liability. *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 90 (1st Cir. 1990) (the "reasonableness equation relates to the relative strength of the parties' litigating positions"). Further, the court considers "the good faith efforts of the negotiators, the opinion of counsel, and the possible risks involved in litigation if the settlement is not approved." *United States v. Hardage*, 750 F. Supp. 1460, 1491 (W.D. Okla. 1990), *aff'd*, 982 F.2d 1436 (10th Cir. 1992) (citing *City of New York v. Exxon Corp.*, 697 F. Supp. 677, 692 (S.D.N.Y. 1988)). "[B]ecause of the clear public policy favoring settlements the court must not substitute its judgment for that of the parties." *United States v. Seymour Recycling Corp.*, 554 F. Supp. 1334, 1338 (S.D. Ind. 1982) (citing *Airline Stewards & Stewardesses Ass'n, Loc. 550, TWU, AFL-CIO v. Am. Airlines, Inc.*, 573 F.2d 960, 963 (7th Cir. 1978)).

98.     The Court has considered and is satisfied with "the good faith efforts of the negotiators, the opinion of counsel, and the possible risks involved in litigation if the settlement is not approved," *Hardage*, 750 F. Supp. at 1491, and finds that the Settlement Agreement is fair and reasonable.

99.     In determining whether the Settlement Agreement is fair, courts also "ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *Cannons Eng'g*, 899 F.2d at 86. Courts determine whether the parties have "had an opportunity to participate in the negotiations." *Id.* at 87.

100.    All parties in this matter have had the opportunity to negotiate. Each party was present at the mandatory mediation and engaged in negotiations relative to the

settlement of this matter. Each party had an opportunity at the fairness hearing to present evidence. The parties then agreed to proposed findings of fact and conclusions of law to the Court. *See* [Doc. No. 186]. The Court is satisfied with the openness and bargaining balance of the negotiation and settlement process.

101.    Courts also look at how the "reasonableness equation relates to the relative strength of the parties' litigating positions." *Cannons Eng'g*, 899 F.2d at 90.

102.    The strength of the parties' litigation positions, as set forth above and in the filings in this case, was assessed during the mandatory mediation. Further, the parties put forth evidence of their respective positions, claims, and defenses at the fairness hearing, the motions to dismiss, and the motions for summary judgment. *See also* [Doc. No. 182, with exhibits]. The Court has looked beyond the fact that the parties consent to settlement and acknowledges that this case appears to contain many complex issues of disputed fact and law.

103.    The Settlement Agreement is consistent with CERCLA and "public policy generally supports 'a presumption in favor of voluntary settlement' of litigation." *United States v. Lexington-Fayette Urb. Cty. Gov't*, 591 F.3d 484, 490 (6th Cir. 2010) (quoting *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991)).

104.    All factors in determining whether a settlement agreement is fair and reasonable are met. The Court finds that based upon the arguments of the parties and the evidence presented in this case, the Settlement Agreement is fair and reasonable and consistent with the purposes of CERCLA.

105.    When parties settle, the Court has the authority to issue contribution

protections to settling defendants, issuing orders that contain contribution bars prohibiting nonsettling potentially responsible parties ("PRP") from filing claims against settling PRPs. *See* 42 U.S.C. § 9613(f); *FMC Corp. v. Aero Indus., Inc.*, 998 F.2d 842, 846–47 (10th Cir. 1993); *Atl. Richfield Co. v. Am. Airlines, Inc.*, 836 F. Supp. 763, 777 (N.D. Okla. 1993) (incorporating and adopting report and recommendation). 42 U.S.C. § 9613(f) allows the Court to review the fairness of the settlement and reduce the PRPs' liability by the amount the settling defendants pay (or the percentage of their liability) and allocate response costs.

106.   "Contribution is defined as the 'tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share, the shares being determined as a percentage of fault.'" *Atl. Rsch.*, 551 U.S. at 138 (quoting Black's Law Dictionary 353 (8th ed. 2004)). Courts adopt principles in model laws like the Uniform Comparative Fault Act and the Uniform Contribution Among Tortfeasors Act ("UCATA") to equitably allocate cleanup costs among PRPs. Contribution claims are brought for PRPs who pay more than their fair share.

107.   The *pro tanto* approach is contained in the UCATA, which provides contribution protection to all settling parties and reduces the amount of the nonsettling parties' liability by the amount of the settlements. *Atl. Richfield*, 836 F. Supp. at 764–65. The public policy behind using the *pro tanto* approach is "in favor of expense and delay reduction resulting from early and effective case management and settlement. . . ." *Id.* at 777. The *pro tanto* approach is consistent with the congressional purpose of minimizing

litigation and encouraging settlement of CERCLA cases. *Id.* at 775.[2]

108.    The Court has discretion on a case-by-case basis to apply the *pro tanto* approach or a proportionate share approach (which would not bar contribution claims against Defendants in the future). *See Atl. Richfield*, 836 F. Supp. at 765 (rejecting the proportionate share approach and finding that the *pro tanto* approach was "clearly superior" under the facts there at issue). *See also* Marc L. Frohman, *Rethinking the Partial Settlement Credit Rule in Private Party CERCLA Actions: An Argument in Support of the Pro Tanto Credit Rule*, 66 U. Colo. L. Rev. 711 (1995) (collecting cases).

109.    In the context of complex CERCLA actions, "[i]t is hard to imagine that any defendant in a CERCLA action would be willing to settle if, after the settlement, it would remain open to contribution claims from other defendants. The measure of finality which a cross-claim bar provides will make settlements more desirable." *Allied Corp. v. ACME Solvent Reclaiming, Inc.*, 771 F. Supp. 219, 222 (N.D. Ill. 1990). "A settling defendant therefore 'buys its peace' from the plaintiff, as being relieved of liability to co-defendants frees the settling defendant from the litigation." *Id.* (citation omitted).

110.    The Court finds that adopting the proportionate rule in this case would substantially and unnecessarily complicate trial and resolution, evidentiary burdens, and

---

[2] Under the *pro tanto* approach, nonsettling defendants might pay "more than their fair share whenever a plaintiff settles with a defendant for less than that defendant's equitable share. Plaintiffs commonly accept such settlements because of the benefits of reduced uncertainty and lower litigation costs. When the parties know that the court will employ a *pro tanto* credit, plaintiffs may be tempted to settle first with defendants of lesser resources for low settlement amounts." 2 Superfund & Brownfields Cleanup § 22:16 (standards for court review section).

exposure. In addition, the Court recognizes that Plaintiffs have not filed timely witness and exhibit lists, dispositive motions, or *Daubert* motions, further supporting the conclusion that the Settlement Agreement is desirable and reasonable. Were the Court to apply the proportionate rule, a trial would need to be conducted regarding proportionate shares.[3] Additionally, all parties are in support of the *pro tanto* approach. *See* [Doc. No. 186]. In this particular instance, the Court concludes application of the *pro tanto* rule will best achieve the objectives of CERCLA by encouraging settlement, simplifying the litigation, and equitably distributing cost.

111.    Based on the findings of facts and conclusions of law herein, Defendants' settlement payments are credited *pro tanto*. Any remaining costs or liability remaining should lie with the Plaintiffs and any other PRPs. *See* 42 U.S.C. § 9613(f).

112.    All claims against the Defendants in this suit relating to the Site and

---

[3] As stated in the report and recommendation in *Atl. Richfield*, 836 F. Supp. at 774–75:

> Judges in CERCLA cases who have applied the proportionate rule apparently did not appreciate the monkey wrench it throws into the mechanics of settlement. It is unusual for complex, multi-party cases to settle all at once. Settlement in such cases is a progressive process, usually involving a series of partial settlements. The proportionate rule makes partial settlements enormously difficult. No matter how many parties settle, it still contemplates a full-blown trial, where the proportionate responsibility of every remaining and former party to the litigation is determined. The trial task becomes more difficult, and contested fact issues are multiplied, instead of reduced. For those who have settled, the determination of responsibility is *in absentia*, putting plaintiff in the awkward position of maximizing its damages vis-a-vis the remaining parties and minimizing its damages vis-a-vis the settling parties. In fact, the plaintiff must step into the shoes of settling defendants, often without any detailed knowledge of their defenses or the internal data necessary to present an effective defense.

allegations of Plaintiffs within their complaint, are barred. This includes all past, present, and future counterclaims, crossclaims, and other claims relating to the Site, including claims for contribution under 42 U.S.C. § 9613(f)(1).

## IV.   <u>Conclusion</u>

**IT IS THEREFORE ORDERED** that the Settlement Agreement [Doc. No. 158-1] is fair, reasonable, and approved. The Settlement Approval Motion [Doc. No. 158] is GRANTED. The Court further GRANTS the remaining Motions [Doc. Nos. 173 & 186] as MODIFIED herein.

**IT IS FURTHER ORDERED** that the settlement amounts that each Defendant will pay shall be credited *pro tanto*.

**IT IS FURTHER ORDERED** that all past, present, and future claims, counterclaims, crossclaims, and any other claims relating to the Site are barred against these Defendants.

The Court will enter an administrative closing order that administratively closes this case until the parties effectuate the payments and dismissals agreed to in the Settlement Agreement [Doc. No. 158-1], and as outlined in this Order.

IT IS SO ORDERED this 19th day of October 2022.

_____
JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE